UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA HARAN,<br><br>    Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration<br><br>    Defendant. | )<br>)<br>) NO. 05 C 3202<br>)<br>)<br>) MAGISTRATE JUDGE<br>) ARLANDER KEYS<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Currently before the Court are the parties' Cross-Motions for Summary Judgment. Plaintiff requests that the Court reverse or remand the decision of the Commissioner of the Social Security Administration (the "Commissioner"), finding that Plaintiff was entitled to Supplemental Security Income ("SSI") for a limited period of time, and that she was not entitled to Disability Insurance Benefits ("DIB"). Conversely, the Commissioner seeks to have the decision upheld. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is Granted, in part, and the Commissioner's Motion for Summary Judgment is Denied.

### Procedural History

Patricia Haran applied for DIB and SSI payments on April 8, 1996. R. at 120. Ms. Haran, who was 56 years old

at the time of filing, claimed that she suffered from complications from heart failure, a right leg fracture, asthma, and osteoporosis/osteoarthritis, as well as problems coping with high stress, maintaining concentration, learning, and hearing. *Id.* at 83, 115. Ms. Haran alleged a disability onset date of February 6, 1993 – the day she fractured her right ankle.

The SSA denied her claim initially on August 19, 1996, and upon reconsideration on December 12, 1996. *Id.* at 120, 127. Ms. Haran requested a hearing on January 25, 1997, which was held on October 30, 1997, before Administrative Law Judge ("ALJ") Robert T. Karmgard. *Id.* at 19, 130-132. ALJ Karmgard found that Ms. Haran was eligible for SSI, but that she was ineligible for DIB. *Id.* at 95-98.

Ms. Haran filed a Request for Review of the unfavorable portion of ALJ Karmgard's decision, and a request for the October 1997 hearing tapes. The tapes, however, were lost, prompting the Appeals Council to remand Ms. Haran's case on May 16, 2001, for a *de novo* hearing. *Id.* at 169.

Upon remand, Ms. Haran's case was assigned to a different ALJ, ALJ Cynthia M. Bretthauer (hereinafter "the ALJ"). On April 4, 2002, the ALJ conducted a *de novo* hearing on Ms. Haran's claim. *Id.* at 19, 113, 174. The ALJ

found that Ms. Haran was not entitled to DIB, and that she
was not disabled as of the alleged onset date of February
6, 1993. Notably, the ALJ failed to address Ms. Haran's
entitlement to SSI benefits. *Id.* at 113-18, 196. On June
19, 2002, Ms. Haran appealed the ALJ's decision to the
Appeals Council, and on November 28, 2003, the Appeals
Council vacated the April 2002 decision and remanded the
case for a new hearing. *Id.* at 187, 196-98.

The ALJ conducted Ms. Haran's third hearing on August
17, 2004. *Id.* at 20. On October 27, 2004, the ALJ issued a
decision, finding that: (1) Ms. Haran was not entitled to
DIB or a period of disability prior to July 1, 1995, the
date of expiration of her insured eligibility for such
benefits; (2) Ms. Haran was ineligible for SSI payments
prior to July 16, 1996; and (3) Ms. Haran was disabled as of
July 16, 1996 and until attaining age 65. *Id.* at 35. The
ALJ's decision became the final agency decision when the
Appeals Council denied review on March 29, 2005. *See* 20
C.F.R. § 416.1481.

## I. Ms. Haran's First Hearing

At a hearing held before ALJ Karmgard on October 30,
1997, Ms. Haran, her son Raymond Haran, as well as medical
expert ("ME") David Abramson, M.D., and vocational expert

3

("VE") Linda Gels, testified. *Id.* at 82. ALJ Karmgard also reviewed medical documents and disability application documents in reaching his determination. *Id.* at 82. In addition to this testimony, ALJ Karmgard considered a range of evidence from Ms. Haran's medical file. Unfortunately, the tapes from the hearing before ALJ Karmgard were lost. The Court's discussion is limited to a brief summary of ALJ Karmgard's decision, as well as the medical records, which are a part of the Court's record. *Id.* at 169-70.

## A. Medical Evidence

John F. Kennedy Medical Center – May 1989

Ms. Haran was hospitalized at Our Lady of the Resurrection Medical Center- Emergency Room and admitted to the John F. Kennedy Medical Center in May of 1989 for shortness of breath without chest pain. An x-ray showed bilateral interstitial infiltrate, consistent with pulmonary edema (congestive heart failure). *Id.* at 348, 355. A subsequent x-ray suggested that the congestive pulmonary problems had been resolved. *Id.* at 380. A stress test was administered on May 9, 1989, which showed no chest pain, and an EKG showed no evidence of significant ST-T changes. *Id.* at 382. Ms. Haran was discharged after intubation and eight

4

days of observation. *Id.* at 355. Discharging doctors noted a history of untreated hypertension, and Ms. Haran was advised to see a cardiologist. *Id.*

## Dr. Greenburg

Ms. Haran fractured her right ankle on February 6, 1993. An x-ray revealed right fibula and tibia fractures, swelling, as well as osteoarthritis of the right lower leg. *Id.* at 406, 420. Surgeons performed an open reduction and internal fixation procedure on February 11, 1993, fitted her with a short-leg cast, and limited her from exerting any weight on her lower extremity upon discharge. *Id.* at 428-29.

Attending physician Dr. Martin Greenberg noted Ms. Haran's "multiple pulmonary problems." *Id.* at 428. A chest x-ray performed on that day compared to the May 1989 x-ray, also revealed cardiomegaly, a tortuous aorta, and possible atelectasis of both lung bases. *Id.* at 419. An x-ray three days later showed normal cardiac size, with no active pulmonary infiltrates, but noted again the tortuous aorta and soft tissue densities in both lung bases. *Id.* at 422. Subsequent x-rays in April, May, and August 1993 showed healing of the fracture, as well as osteoporosis and osteoarthritis of her right ankle. *Id.* at 424-26.

Ms. Haran's pins were removed on April 15, 1994. *Id.*
at 461. A pre-operative x-ray on April 13, 1994 revealed
diffuse osteoporosis and a tortuous aorta, but did not
indicate any active pulmonary infiltrate. *Id.* at 473. At
the time, Dr. Greenberg noted that Ms. Haran's medical
history was noncontributory, except for a history of
hypertension, and also noted that Ms. Haran was smoking 1.5
to 3 packs of cigarettes a day. *Id.* at 461.

## Dr. Bacalla, Consulting Physician

On January 27, 1994, Dr. Mila Bacalla performed an
independent internal medicine consultative examination of
Ms. Haran. *Id.* at 450. Ms. Haran complained of pain and
swelling of her injured ankle and stated that she could walk
only a half block without cane use and could only climb one
flight of stairs. *Id.* at 450. She also complained of
difficulty breathing since May 1989, when she had been
hospitalized for pulmonary edema, with evidence of high
blood pressure. *Id.* at 450.

Dr. Bacalla noted that she had not been further treated
since that time for lung or heart complaints. *Id.* at 451.
However, Dr. Bacalla noted a pre-operative x-ray on February
6, 1993 that showed cardiomegaly and pulmonary atalectasis,
and a December 23, 1993 emergency room visit for

hypertension, respiratory infection, and atypical chest pain, which resulted in a prescription for Procardia XL and E-Mycin, which she took for 5 days. *Id.* at 451. Dr. Bacalla observed that Ms. Haran had exertional shortness of breath, as well as a cough that occasionally produced expectoration. *Id.* at 451.

Dr. Bacalla observed that Ms. Haran was slow in getting on and off the examination table, walked with a slight right-side limp, and had difficulty walking on her toes or heels. *Id.* at 451-452. Dr. Bacalla observed that there was some tenderness and swelling of the injured right ankle, but that there was no significant restriction of movement of the right ankle. *Id.* at 453. The doctor recorded increased thickness of the chest walls and harsh breath sounds. *Id.* at 452. Dr. Bacalla did not observe any evidence of congestive heart failure, or edema of the legs. *Id.* at 454. The doctor indicated no spinal deformities. *Id.* at 453. Finally, Dr. Bacalla noted that Ms. Haran was obese, had gained 40 pounds in 4 months, and smoked at least 1 pack of cigarettes a day. *Id.* at 451.

## Dr. Mizuno – Treating Physician

Dr. Eric Mizuno examined Ms. Haran eight times between April and October of 1996. *Id.* at 510-17. On her first

7

visit, Ms. Haran reviewed her history of congestive heart failure and hypertension, complained of shortness of breath and right abdominal pain, and presented some lower extremity edema. *Id.* at 517. Dr. Mizuno also recorded some bi-basilar crackles and prescribed Lasix and K-Dur and advised her to get cardiac tests. *Id.* at 517. Because Ms. Haran was uninsured at the time, Dr. Mizuno suggested going to Cook County Hospital, where such tests would be free. *Id.* at 517.

Successive visits showed continuing abdominal pain and mild bi-basilar crackles, which had cleared by the end of April, when Dr. Mizuno prescribed Zoloft. *Id.* at 515-16. By June 1996, Ms. Haran had stopped taking Zoloft independently and had no cardiopulmonary complaints; Dr. Mizuno resumed her Zoloft treatment as her unintended weight gain was improving. *Id.* at 514.

During a July 1996 examination, Ms. Haran revealed that she had not yet procured the cardiac tests that Dr. Mizuno had previously recommended, and she complained of dyspnea, lower extremity edema, and increasing problems with memory and concentration. *Id.* at 513. On July 25, 1996, Dr. Mizuno wrote a letter to the Illinois Department of Rehabilitation Services, characterizing Ms. Haran's

condition as "congestive heart failure with possible coronary artery disease as an underlying cause." *Id.* at 484. Dr. Mizuno expressed concern that, due to Ms. Haran's financial situation, required cardiac tests could not be performed, and stated that he would be unable to provide full diagnosis and treatment without such tests. *Id.* He expressed a similar concern for a possible neuropsychological problem, for which he stated a CT scan would be necessary before full diagnosis and treatment could be assessed. *Id.* Finally, Dr. Mizuno opined that Ms. Haran was disabled. *Id.*

In an August examination, Ms. Haran's condition was unchanged. Dr. Mizuno again urged her to avail herself of free cardiac tests at Cook County Hospital. *Id.* at 512. Successive visits showed no change in her alleged condition. *Id.* at 510-11.

## Dr. Robert Beebe's Psychological Assessment

On July 16, 1996, psychiatrist Dr. Robert Beebe examined Ms. Haran for the Illinois Bureau of Disability. *Id.* at 475. She complained of memory and concentration problems, manifested in forgetfulness such as not making phone calls to people, leaving the oven on for a day and a half, and having to write reminder notes, which she would

9

lose. *Id.* at 475. Ms. Haran told Dr. Beebe that she had trouble with learning new skills: for example, because she could not learn the computer system at Red Lobster, she quit; she had left a job at a taxi company as a dispatcher because of similar problems. *Id.* at 475. Ms. Haran told Dr. Beebe that she had worked in offices for 15 years and as a waitress or bartender for 19 years, with a 10th grade education. *Id.* at 476. She said she was generally unhappy, had trouble sleeping and losing weight. *Id.* at 476. Ms. Haran further stated that, on a typical day, she did nothing and stayed in her apartment with her legs elevated, trying to read a book, do crossword puzzles, or watch TV and listen to the radio. *Id.* at 477. She said she did laundry once a month, went grocery shopping, and cleaned her apartment when she felt up to it. *Id.* at 477-78. Dr. Beebe diagnosed Ms. Haran with an "Adjustment Disorder Not Otherwise Specified," and suggested that she was seriously limited in her ability to relate to supervisors, co-workers, and the public, unable to maintain proper attention and concentration, deal with stress, and unable to carry out instructions. *Id.* at 477. Dr. Beebe noted that Ms. Haran had good recall and was of average intelligence. *Id.*

Dr. Panopio's Medical Examination

On the same day, Dr. Edith Panopio performed an internal medicine examination of Ms. Haran. *Id.* at 479. Ms. Haran's chief physical complaint was her heart. *Id.* In developing her medical history, Dr. Panopio noted that Ms. Haran alleged having a heart attack seven years prior and had continued shortness of breath. *Id.* at 479. She had not been treated for this shortness of breath, but Ms. Haran claimed that she had quit smoking as of April 1996. *Id.* at 479. Ms. Haran had recently redeveloped sharp, shooting chest pains in the last year and had been told to procure some cardiac exams. *Id.* at 479-80. Dr. Panopio noted that Ms. Haran was nervous and apprehensive, and he insisted that she get the required cardiac exams that Dr. Mizuno had previously requested. *Id.* at 481.

Dr. Panopio noted that Ms. Haran did not have trouble getting on and off the examining table, had a normal gait, and was able to walk on her heels and toes. *Id.* at 481. Ms. Haran did complain of pain in her right ankle and swelling in both of her ankles. *Id.* at 480. Dr. Panopio also noted some limitation on Ms. Haran's range of motion. *Id.* at 483. Dr. Panopio observed that Ms. Haran was overweight, measuring 63" and weighing 189 pounds. *Id.* at 480. Upon physical examination, the doctor recorded that

11

Ms. Haran's breathing was normal. *Id.* at 481. Dr. Panopio found no clinical evidence of congestive heart failure, found that her chest pain descriptions were not consistent with angina, and found no heart abnormalities or lung diseases. *Id.* at 482.

## Dr. Arbit's Neuropsychological Examination

The Disability Determination Services requested a neuropsychological test, which was performed on June 3, 1997, by Dr. Jack Arbit. *Id.* at 540. He administered the Luria-Nebraska Neuropsychological Battery, and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). In addition, Ms. Haran completed a Medical Assessment of Ability to do Work-Related Activities (Mental). *Id.* Dr. Arbit found that Ms. Haran was below the "critical level" on the Luria-Nebraska, but within the normal range for her intellectual ability, motor functions, rhythm, tactile, visual, receptive speech, expressive speech, writing, reading, arithmetic, and memory functions. *Id.* Ms. Haran had clinically meaningful scores in 10 of the 17 scales of the MMPI-2, but Dr. Arbit noted that it may have been an invalid profile, due to a high "faking bad" T-Score. Nevertheless, Dr. Arbit noted that Ms. Haran displayed a high level of anxiety. *Id.* at 540-41. Dr. Arbit concluded

that there was no neuropsychological problems, but found that Ms. Haran had high anxiety, which may have caused a fixation and over-elaboration of psychological, medical, and emotional problems. *Id.* at 541.

Other Medical Evidence

On January 14, 1997, Ms. Haran visited the emergency room complaining of chest pain. An EKG showed non-specific T-wave abnormalities, and the examining physician noted bilateral basal rales and edema in the legs. *Id.* at 523, 528. A June 5, 1997 echocardiogram revealed mild left ventricular hypertrophy. *Id.* at 550. On June 16, 1997, Dr. Lise Weisberger examined Ms. Haran, and found that there was emphysema in the upper lungs and peribronchial thickening. *Id.* at 552.

On August 22, 1997, a pulmonary function report was conducted, and Ms. Haran was diagnosed with hypertension and emphysema. *Id.* at 560-562. These results showed 62% post-bronchodilator FEV1/FEV results, and diffusion outside the normal range. *Id.* at 93, 560-62

**B. ALJ Karmgard's Decision**

ALJ Karmgard issued a written opinion on November 25, 1998, finding Ms. Haran disabled since July 16, 1996, but not before that date. Consequently, ALJ Karmgard determined

13

that Ms. Haran was ineligible for DIB, because her insured status had expired on June, 30, 1995. Nevertheless, Ms. Haran was eligible for SSI benefits. *Id.* at 95-98.

In commenting on Ms. Haran's condition, ALJ Karmgard noted that Ms. Haran alleged a persistent cough, shortness of breath, fluid build-up and swelling in the legs and ankles, daily chest pain and intermittent pain of the right breast, back side, and stomach, difficulty sleeping, memory loss, anxiety, impaired concentration, and an inability to learn new job skills. *Id.* at 85. ALJ Karmgard evaluated Ms. Haran's residual functional capacity ("RFC"), finding that her impairments from the period from February 6, 1993 through July 15, 1996 precluded the following: lifting 10 pounds more than occasionally or 5 pounds frequently; sitting for more than 6 hours; standing or walking more than occasionally; bending, stooping, or climbing more than occasionally; and working in poorly ventilated environments that allowed exposure to moderate levels of respiratory irritants. *Id.* at 85.

ALJ Karmgard found that the objective medical evidence did not support a finding of disabling symptoms and limitations prior to July 16, 1996, or of a limitation greater than the RFC described above. *Id.* at 85.

14

Consequently, ALJ Karmgard determined that Ms. Haran was not eligible for DIB, as Ms. Haran's date last insured of June 30, 1995. *Id.* at 85-86. In finding that Ms. Haran retained the capacity to perform past relevant work prior to July 16, 1996, ALJ Karmgard considered Ms. Haran's lack of treatment history, with gaps of up to two years between visits, very persuasive. *Id.* at 88, 91.

However, ALJ Karmgard concluded that the medical evidence did support Ms. Haran's allegations of disability since July 16, 1996. *Id.* at 92. ALJ Karmgard concluded that Ms. Haran's mental impairments after that date rendered her disabled. Specifically, ALJ Karmgard found that Ms. Haran was unable to maintain concentration, had memory losses, had persistent coughing and shortness of breath, had swelling in her legs and ankles, was unable to stand and walk for long periods of time, and had to take frequent breaks. *Id.* at 91.

In light of Ms. Haran's mental impairments, ALJ Karmgard found that Ms. Haran's RFC, as of July 16, 1996, prohibited the following: interacting well with supervisors, co-workers, and others; managing stress; maintaining attention and concentration; understanding, remembering, executing detailed and complex work

instructions or tasks; performing tasks that required an ability to behave in an emotionally stable manner; or relate predictably in social situations. *Id.* ALJ Karmgard found that Ms. Haran could not perform past relevant work or perform any other job existing in significant numbers in the economy, and was, therefore, disabled as of July 16, 1996.

## II. Ms. Haran's Second Hearing

On January 18, 1999, Ms. Haran filed a Request for Review to appeal the unfavorable portion of ALJ Karmgard's decision and requested copies of the October 1997 hearing tapes. *Id.* at 167. The Appeals Council remanded Ms. Haran's case on May 16, 2001, after it was determined that the tapes from the first hearing had been lost. *Id.* at 169. This second hearing was held on April 4, 2002 before ALJ Bretthauer. *Id.* at 113. Ms. Haran, Raymond Haran, and VE Susan Entenberg testified. *Id.* Notably, the ALJ did not seek testimony from an ME. *Id.*

ALJ Bretthauer considered the same medical evidence as ALJ Karmgard, in addition to the following medical reports from Dr. Arias and Dr. Mizuno. *Id.* at 115.

### Additional Medical Evidence

Pulmonologist Dr. Arias examined Ms. Haran in September of 1997 and January of 1998. *Id.* at 27, 564. Dr. Arias

16

diagnosed Ms. Haran with chronic obstructive pulmonary disease ("COPD") and emphysema. *Id.* at 27. Dr. Arias prescribed Ventolin, Atrovent, and Aerobid, in addition to the Albuteral she was already using. *Id.* No medical records are present until May, 12, 2000, when a chest x-ray ordered by Dr. Mizuno showed minimal scoliosis, degenerative changes in the thoracic spine, possible acute bronchitis, a normal heart size, a tortuous aorta, and bilateral atelectasis. *Id.* at 567.

On July 6, 2000, Dr. Mizuno wrote an additional letter describing Ms. Haran's condition as recurrent congestive heart failure, chronic obstructive disease, chronic bronchitis, and asthma requiring the use of a nebulizer. *Id.* at 565. On October 24, 2001, Dr. Mizuno again wrote on Ms. Haran's behalf summarizing her ailments as chronic bronchitis, memory problems, chronic fatigue, and joint complaints. *Id.* at 566. In a final letter, dated August 3, 2004, Dr. Mizuno alleged that Ms. Haran had stage IV head and neck cancer[1]. *Id.* at 577.

## A. Testimony at Ms. Haran's Second Hearing
Ms. Haran's Testimony

---

[1]   This evidence was not before the ALJ until after Ms. Haran's second decision was issued.

Ms. Haran testified that, since her alleged date of disability on February 6, 1993, she had worked sporadically as a waitress at two restaurants for a total of four months, and occasionally as a bartender. *Id.* at 23, 45-47, 53. She further testified that she had worked most recently as a cab dispatcher for two months, during November and December 1995; however, she left because she "kept messing up with the drivers and their routes." *Id.* at 23, 44-45. Ms. Haran also testified that she had developed concentration and memory problems that interfered with her ability to use computers at work. *Id.* at 52-53.

Ms. Haran testified that she has lived in a second-floor apartment in her mother's house from 1993 to the present. *Id.* at 58. Ms. Haran stated that she injured her ankle on February 6, 1993, and required two surgeries for pin placement and removal, and applied for disability as a result of this incident. *Id.* at 55. After this injury, Ms. Haran claimed that she developed complications with fluid build-up in her legs and discovered that she had osteoarthritis and osteoporosis. *Id.* at 56-57. She testified that she was unable to walk more than half a block without difficulty breathing and pain in her knees, ankles, and hips, requiring her to elevate her legs. *Id.* at 58-59.

Ms. Haran also testified that she had complications from asthma and was acquiring medication to treat it from a friend. *Id.* at 62. Ms. Haran testified that she had respiratory problems in the past, which resulted in the loss of a telephone sales representative job that she had held from 1980 until 1985. Ms. Haran explained that she had coughing fits that made it difficult to talk to customers on the phone. *Id.* at 49. Although she was a smoker, she claimed a smoking office environment exacerbated her breathing difficulties. *Id.* at 51. As a result, Ms. Haran testified that she did little when she was home, short of laundry once a month, grocery shopping, or cleaning the house whenever she felt like it. *Id.* at 58-59. Ms. Haran further testified that she lacked sufficient insurance to treat many of her complaints, including acquiring cardiac tests. *Id.* at 62.

## Raymond Haran's Testimony

Ms. Haran's son, Raymond Haran, also testified at the hearing. Mr. Haran stated that he helped his mother go grocery shopping by helping her down the stairs, doing some of her shopping, and carrying her groceries upstairs for her. *Id.* at 66. Mr. Haran confirmed that his mother had trouble breathing and talking for long periods without

19

coughing. *Id.* at 67.

**VE Entenberg's Testimony**

Finally, Susan Entenberg, a vocational expert ("VE"), testified. VE Entenberg described Ms. Haran's previous work experiences as light to medium in exertion, and unskilled to semi-skilled. *Id.* at 69. The ALJ asked VE Entenberg whether an individual who was 53-56 years old, who could lift five to ten pounds occasionally, who needed to elevate her legs once every three hours for ten to fifteen minutes, who could walk only two hours a day, who could occasionally bend, stoop, climb, and must avoid exposure to pulmonary irritants could perform Ms. Haran's past work. *Id.* at 69-70. VE Entenberg responded that this hypothetical individual would be capable of working light, sedentary, low-to-medium stress level jobs, but that she likely had no transferable skills to appropriate employment. *Id.* at 69-71. The ALJ posed an additional hypothetical, describing someone who could lift and carry five pounds frequently, and ten pounds occasionally, who would need to elevate her legs once every three ours, who could stand or walk only two hours of the day, and who must avoid moderate exposure to pulmonary irritants. *Id.* at 70. VE Entenberg responded that such a person would be unable to perform any of Ms. Haran's past

work and that there were no transferable job skills. *Id.* at
70-71.

## B. The ALJ's April 26, 2002 Decision

The ALJ found that Ms. Haran was not entitled to DIB
and had not been disabled prior to her alleged onset date of
February 6, 1993. *Id.* at 113-118. This opinion did not
address Ms. Haran's entitlement to SSI benefits. *Id.* at
196. The ALJ declared that Ms. Haran needed to establish
disability on or prior to her date last insured-- June 30,
1995. The ALJ determined that Ms. Haran had not engaged in
substantial gainful activity, agreeing with ALJ Karmgard.
*Id.* at 114. The ALJ determined that Ms. Haran's RFC
precluded lifting more than 20 pounds occasionally or more
than 10 pounds frequently, climbing ladders, ropes, or
scaffolds, more than occasional use of stairs or ramps,
concentrated exposure to pulmonary irritants, and high
levels of work-related stress. *Id.* at 114. The ALJ
concluded that the medical evidence failed to provide
support for Ms. Haran's allegations of an inability to walk
more than half a block, her breathing difficulties,
swelling, asthma, and osteoporosis/osteoarthritis. *Id.* at
114-15. Therefore, there were no limitations greater than
the stated RFC. *Id.* In reaching her decision, the ALJ also

found it "compelling" that Ms. Haran did not seek treatment for two years between March 1994 and April 1996. *Id.* at 116. The ALJ found that Ms. Haran could perform "past relevant work," and was, therefore, not entitled to a period of disability or DIB *Id.* at 117-18.

## III. Ms. Haran's Third Hearing

Ms. Haran appealed the ALJ's decision on June 19, 2002, and the Appeals Council vacated the April 2002 decision and remanded for a new hearing, under the error of law provision of the SSA regulations. *Id.* at 187, 196-198. The Appeals Council mandated that, on remand, the ALJ should do the following: obtain additional evidence of Ms. Haran's status post congestive heart failure and right ankle fracture; further evaluate Ms. Haran's complaints; evaluate Ms. Haran's mental impairments; further consider Ms. Haran's maximum RFC and provide reasoning with evidentiary support for assessed limitations; if necessary, obtain evidence from an ME to determine the nature and severity of Ms. Haran's impairment; if necessary, obtain supplemental evidence from a VE to determine the effect of assessed limitations on Ms. Haran's ability to work; determine any acquired transferable skills; and conduct appropriate hypothetical questioning that reflected the RFC and limitations established by the

record. *Id.* at 197.

The ALJ conducted Ms. Haran's third hearing on August 17, 2004. *Id.* at 20. Ms. Haran did not testify, having waived her right to do so. *Id.* The ALJ did not utilize an ME in this subsequent hearing, and relied on the recorded testimony of both Ms. Haran and VE Entenberg from the April 2002 hearing. *Id.* In making her determination, the ALJ relied on Ms. Haran's previous medical records and one recent addition.

Before the August 17, 2004 hearing, Ms. Haran submitted a report from Dr. Julian Freeman. *Id.* at 568-69. After reviewing Ms. Haran's medical records, Dr. Freeman confirmed a myocardial infarction and ischemic heart disease in 1989. *Id.* at 569. Dr. Freeman's diagnoses included a continuous congestive heart failure present intermittently since 1989 and continuous since 1996, a mental dysfunction triggered by the congestive heart failure, post-traumatic arthritis of the right ankle since the ankle fracture, and moderate obesity resulting in current impairment. *Id.* at 572-73. Dr. Freeman also found that Ms. Haran was limited to lifting and carrying no more than 10 pounds rarely, 5 pounds occasionally, and one pound or less frequently, walking or standing for more than two hours of an eight-hour workday,

continuous walking or standing of more than five minutes each, and climbing stairs. *Id.* at 30.

## B. The ALJ's October 24, 2004 Decision

The ALJ found that Ms. Haran was not disabled prior to July 16, 1996. The ALJ determined that, from February 1993 to July 1996, Ms. Haran had several severe impairments, including status-post right ankle fracture, hypertension, and congestive heart failure, and assigned an RFC that precluded the following: lifting 10 pounds more than occasionally or 5 pounds frequently; sitting for more than 6 hours; standing or walking more than occasionally; bending, stooping, or climbing more than occasionally; and working in poorly ventilated environments that allowed exposure to moderate levels of respiratory irritants.

Despite these limitations, the ALJ found that Ms. Haran's RFC permitted a range of light work. In making this determination, the ALJ considered the opinions of DDS physicians Dr. Bacalla and Dr. Panopio, the medical evidence, including the 1993 ankle fracture, subsequent medical examinations by her treating physician Dr. Mizuno, and the two large gaps in the medical evidence from August 1993 to January 1994 and May 1994 to March 1996. The ALJ found that there was little objective evidence of cardiac or

24

lung impairment or edema prior to July 1996, but did include a limitation on moderate exposure to pulmonary irritants in the RFC. The ALJ made no specific inquiry into whether Ms. Haran's cardio-pulmonary impairments had a more severely limiting effect on her RFC before the July 16, 1996 diagnosis date.

Beginning in July 16, 1996– the date Dr. Beebe diagnosed Ms. Haran with adjustment disorder NOS, and until Ms. Haran turned 65, the ALJ found that Ms. Haran was disabled and had an RFC to lift and carry no more than 10 pounds at a time, stand, or walk no more than 2 hours, sit no more than 6 hours, limited ability to deal with coworkers, supervisors or the public, difficulty dealing with stress, maintaining concentration and attention, behave in an emotionally stable manner, relate to others predictably, and carry out complex job instructions. The ALJ concluded that, after July 16, 1996, Ms. Haran was unable to perform any of her past relevant work. The ALJ found that Ms. Haran was not eligible for DIB at any time prior to expiration of her insured status on July 1, 1995, and ineligible for SSI payments prior to July 16, 1996, but eligible for SSI benefits starting on her onset date of July 16, 1996. *Id.* at 34-36.

## Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan* 912 F.2d 178, 181 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Rather, the Court must accept findings of fact that are supported by "substantial evidence,",42 U.S.C. §405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quoting *Richardson v. Perales*, 403 U.S. 389, 401 (1971).)

This does not mean that the Commissioner (or the ALJ) is entitled to unlimited judicial deference, however. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). When the ALJ fails to mention rejected

evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981) that such explanation is absolutely essential for meaningful appellate review.)

Further, while the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski* at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 472, 477-78 (1951) )(where substantial evidence in favor of the agency's decision cannot be determined in isolation from the aggregate record.)

## **Social Security Regulations**

The Social Security Regulations (the "Regulations") prescribe a five-step sequential analysis to determine

whether a claimant is disabled. 20 C.F.R. §404.1520 (2003).
The ALJ must consider whether the claimant: (1) is presently
employed; (2) has a severe impairment or combination of
impairments; (3) has an impairment that meets or medically
equals any impairment listed in the Regulations as being so
severe as to preclude gainful activity; (4) is unable to
perform her past relevant work; and (5) is unable to perform
any other work existing in significant numbers in the
national economy. *Young v. Sec'y of Health & Human Servs.*,
957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. §404.1520
(2003). A negative answer at any step other than step three
precludes a finding of disability. *Id.* At 389. The
Plaintiff has the burden of proof at steps one to four.
*Id.; Balenton v. Halter*, 156 F. Supp. 2d 776, 782 (N.D. Ill.
2001). If the claimant's burden is met, the burden shifts
to the Commissioner at step five to show that claimant has
the ability to engage in other work existing in significant
numbers in the national economy. *Young*, 957 F.2d at 389;
*Balenton*, 156 F. Supp. 2d at 782.

## Discussion

Ms. Haran argues that the ALJ's decision was not based
on substantial evidence and contains numerous errors of law.
Specifically, Ms. Haran claims that: (1) her case should

28

have been remanded to ALJ Karmgard; (2) the ALJ should have

utilized a medical expert in determining her RFC; (3) the

ALJ erred at Step Four of the sequential evaluation, by

failing to properly evaluate Ms. Haran's capability of

performing past relevant work; (4) the ALJ posited flawed

hypothetical questions to the VE, because the questions did

not include Ms. Haran's mental limitations; (5) the ALJ

erred in analyzing Ms. Haran's ability to work in a

competitive workplace and did not sufficiently consider the

impact of Ms. Haran's obesity and arthritis on her RFC; and

(6) the ALJ did not make proper credibility findings,

because she dismissed Ms. Haran's subjective complaints and

improperly considered Ms. Haran's application for

unemployment benefits. The Court will discuss each argument

in turn.

**I. Ms. Haran's Case Did Not Require Remand to the Same ALJ**

Ms. Haran questions the ALJ's decision as Hearing

Office Chief to assign the case to herself, and to evaluate

her without considering any of the testimony from Ms.

Haran's initial hearing. Ms. Haran argues that the

Commissioner erred in remanding her case to the ALJ. Ms.

Haran claims that, instead, the regulations indicate that

the Commissioner should have remanded her case to ALJ

Karmgard after the Commissioner lost the October 1997 hearing tapes. Ms. Haran points to 20 C.F.R. § 404.977(a) and insists that, in the event of lost hearing tapes, remand to the same ALJ is implied in the regulatory language, which reads as follows: "[t]he Appeals Council may remand a case to an administrative law judge so that he or she may hold a hearing and issue a decision or a recommended decision. The Appeals Council may also remand a case in which additional evidence is needed or additional action by the administrative law judge is required." 20 C.F.R. § 404.977(a).

Ms. Haran also points to the Social Security Administration Hearings Appeals and Litigation Law Manual ("HALLEX"), where HALLEX, § I-3-7-14(F) states that "[w]hen the Appeals Council is considering a request for review and finds that a hearing recording is lost or inaudible, it will grant the request for review and remand the case for an opportunity for another hearing." *Id.* Ms. Haran also relies on HALLEX § I-3-7-14(G), which addresses the procedure when a claimant objects to a decision issued by an ALJ who did not conduct the hearing:

> [w]hen the ALJ who conducted the hearing is unable to issue the decision because he or she leaves the Social Security Administration, dies, etc., another ALJ may

issue the decision . . . . If the claimant objects to
this procedure and if the credibility of testimony or
the demeanor of a witness is critical to the decision,
the Appeals Council may vacate the decision and remand
the case to an ALJ for a supplemental hearing and a new
decision. The ALJ will base the decision on the
evidence and oral testimony the ALJ receives in
connection with the supplemental hearing, as well as
the evidence and testimony received in connection with
the original hearing.

HALLEX § I-3-7-14(G).

The Commissioner counters that, while generally cases
are remanded to the same ALJ, the selection of an ALJ on
remand is within the Commissioner's discretion. The
government concedes that application of internal procedures
usually result in the same ALJ presiding over a remand, but
notes that, in the absence of allegations of bias or
partiality, these procedures are merely nonbinding
guidelines.

Further, the government contends that the HALLEX
guidelines cited by Ms. Haran do not support her proposition
that the same ALJ must preside over the claim on remand.
Specifically, the government argues that HALLEX I-3-7-14(G)
is not controlling here, because that provision addresses a
claimant's objection to a decision issued by an ALJ who did
not conduct the hearing, not where a second *de novo* hearing
is presided over by a new ALJ, who did not author the

initial decision. In addition, the Commissioner notes that there may have been other factors that led to ALJ Karmgard's unavailability to hear Ms. Haran's case on remand.

There is little case or statutory law discussing the Commissioner's obligation to assign a remanded case to a specific ALJ. *Lidy v. Sullivan*, 745 F. Supp. 1411, 1417 (S.D. Ind. 1989) (reviewing the small amount of relevant case law and concluding that the most important consideration was whether the claimant received a full and fair trial). Unless the ALJ's impartiality is questioned, the regulatory language does not impose an affirmative duty on the Commissioner to remand a case to a specific ALJ. Furthermore, HALLEX does not have the authority of law and is designed to act as internal guidelines for the SSA. *Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, *19 (N.D. Ill. Jun. 19, 2004).

In this case, the Commissioner's primary obligation was to ensure that Ms. Haran received a full and fair resolution of her claim. Because the hearing tapes were lost – through no fault of Ms. Haran – the only way to accomplish this task was to order a *de novo* hearing, which is precisely what occurred here. The Commissioner vacated the first decision and directed the ALJ to make all determinations concerning

Ms. Haran's disability status. Ms. Haran received a new hearing, complete with testimony and the opportunity to supplement her medical record. This was perhaps less efficient and more time-consuming than necessary; however, the Commissioner was within her discretion to remand Ms. Haran's case to a different ALJ. Therefore, the Commissioner did not err in failing to order that Ms. Haran's case be heard before ALJ Karmgard.

## II. The ALJ's Determination of Ms. Haran's RFC without the Use of an ME Was in Error

Ms. Haran argues that the ALJ should have called upon an ME to help determine her RFC. Ms. Haran argues that, in light of the slowly-progressing nature of her illnesses – specifically, her congestive heart failure and her mental impairments, an ME's testimony was critical in this case. The Commissioner counters that it is within the ALJ's discretion to call an ME, and the ALJ's failure to do so was not in error.

Generally, it is within the ALJ's discretion to call an ME to assist in the decision-making process and disability onset determination. *See* 20 C.F.R. §§ 404.1527(f)(2)(iii), 404.1529(b) (both provisions utilizing "may" regarding an

33

ALJ's decision to use a medical expert). The determination of a claimant's RFC is the role of the ALJ, and not an ME. *Yourek v. Barnhart*, 334 F. Supp. 2d 1090, 1092 (N.D. Ill. 2004) (rejecting claimant's contention that ALJ was required to call ME to determine RFC.) An RFC determination is a legal, not medical, decision. 20 C.F.R. § 404.1527(e)(2). To determine a claimant's RFC, an ALJ should review all relevant evidence, including medical evidence. 20 C.F.R. § 404.1545(a)(3); *Social Security Ruling* ("SSR") 83-20 ("The medical evidence serves as the primary element in the onset determination.")

However, a medical expert should be called where a disability onset date must be inferred, either because of a lack of sufficient medical evidence, or where the date last worked and the alleged disability date are far apart or far in the past. *Dutka v. Apfel*, NO. 97 C 8604, 1999 WL 202910 at *4 (N.D. Ill. Mar. 31, 1999); SSR 83-20. To infer the onset date of a disability of non-traumatic origin[2], SSR 83-20 requires an ALJ to consider: "1) the applicant's own allegations; 2) work history; and 3) medical and other

---

[2] To determine the onset date of disabilities of traumatic origin, the ALJ uses the date of injury. *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987).

evidence of the severity of the applicant's condition."

*Dutka*, at *4-5 (citing SSR 83-20). The language of SSR 83-
20 indicates reliance upon an ME when the onset date must be
inferred, stating that:

> With slowly progressing impairments, it is sometimes
> impossible to obtain medical evidence establishing the
> precise date an impairment became disabling. Determining
> the proper onset date is particularly difficult, when,
> for example, the alleged onset and the date last worked
> are far in the past and adequate medical records are not
> available. In such cases, it will be necessary to infer
> the onset date from the medical and other evidence that
> describe the history and symptomatology of the disease
> process . . . . In some cases it may be possible, based
> on the medical evidence, to reasonably infer that the
> onset of a disabling impairment occurred some time prior
> to the date of the first recorded medical examination,
> e.g., the date the claimant stopped working. How long
> the disease may be determined to have existed at a
> disabling level of severity depends on an informed
> judgment of the facts in the particular case. This
> judgment, however, must have a legitimate medical basis.
> At the hearing, the ALJ should call on the services of a
> medical advisor when onset must be inferred.

SSR 83-20.

The critical date to determine disability is the onset
date, not the date of diagnosis. *Lichter*, 814 F.2d at 435.
It is error for an ALJ simply to select the diagnosis date
for determining the onset of an impairment, especially when
there is a lack of previous objective evidence. *Lichter*,
814 F.2d at 435. An ALJ should not use "the first date of
diagnosis solely because no earlier diagnosis date is

available, but rather an ALJ must obtain medical and non-medical evidence." *Id.; Rohan v. Barnhart*, 306 F.Supp.2d 756, 767-68 (N.D. Ill. 2004); SSR 83-20.

In *Dutka*, 1999 WL 202910 at \*4, the claimant alleged that he suffered from congestive heart failure and advanced arthritis; the ALJ fixed the date of diagnosis as the onset date. *Id.* at \*11. The court found that the diagnosis date was inconsistent with the medical evidence, and the lack of an ME there lead to a finding that the ALJ's disability determination was not supported by substantial evidence. *Id.* at \*12. Specifically, the court found that, with a slowly progressing disease, such as congestive heart failure, SSR 83-20 called for the use of an ME. *Id. See also Rice v. Apfel*, 8 F.Supp. 2d 769, 774 (N.D. Ill. 1998) (using same analysis and requiring use of an ME for SSR 83-20 for chronic obstructive pulmonary disease and other pulmonary impairments).

Similarly, the Seventh Circuit has considered the ALJ's duties under SSR 83-20 in relation to allegations of a mental impairment. In *Lichter*, 814 F.2d at 432, the claimant alleged a mental impairment stemming from an automobile accident, which resulted in other physical injuries. While the claimant alleged that he was suffering

from this mental impairment before his diagnosis date, the
ALJ found no objective medical evidence to support this
contention and did not engage in an SSR 83-20 inquiry. The
ALJ used a diagnosis date from the claimant's doctor as the
date of onset, despite the doctor's opinion that the mental
impairment likely existed before his diagnosis. *Id.* at 436.
In addition, there were two other medical opinions that
concluded that the claimant may have a mental impairment
developing sometime after the traumatic automobile injury.
*Id.* at 436.

The Seventh Circuit vacated and remanded for
application of SSR 83-20. The court found that, while the
claimant failed to produce medical reports that referred to
an earlier onset date, "had the ALJ applied SSR 83-20, the
lack of this particular evidence alone would not have been
determinative." *Lichter*, 814 F.2d at 435. The Seventh
Circuit explained that "where there is no medical evidence
as to the precise onset date, but where the disabling
impairment seems to have occurred prior to the date of the
first recorded medical examination, the ALJ 'should call on
the services of a medical advisor' to help in making the
necessary inferences." *Id.* at 434-35.

Ms. Haran claims that the onset date for her physical

disabilities was February 6, 1993, the date of her right-ankle fracture. The ALJ determined that Ms. Haran's onset of disability date was July 16, 1996. In making this determination, the ALJ rejected Dr. Freeman's opinion that Ms. Haran's impairments were likely disabling prior to this date, because there was "no clinical evidence of mental dysfunction prior to July 1996, and no evidence which might suggest that the claimant's congestive heart failure symptoms . . . were more than intermittent." R. at 29. Instead, the ALJ was persuaded by Dr. Panipio's July 1996 finding of no abnormal cardiac functioning, and Dr. Arbit's June 3, 1997 conclusion that Ms. Haran suffered from nothing more than an anxiety disorder[3]. Importantly, the ALJ decided that "[i]n a case such as this, where little or no objective medical evidence of impairment exists for the period prior to July 1996, I consider the eliciting of interpretive testimony from a medical expert to be a superfluous gesture." R. at 29.

But Seventh Circuit caselaw directs that the use of an

---

[3] Notably, the ALJ found persuasive Dr. Beebe's July 1996 diagnosis of an adjustment disorder NOS, and selected Dr. Beebe's diagnosis date as Ms. Haran's onset date. It strikes the Court as inconsistent for the ALJ to rely upon both Dr. Beebe's 1996 diagnosis, as well as Dr. Arbit's subsequent and seemingly contradictory diagnosis.

ME is appropriate under these exact circumstances. *See,*
*e.g., Lichter*, 814 F.2d 430. An ME would have been in a
better position to infer, from the available medical
evidence and its apparent gaps, an appropriate onset date.
*See* SSR 83-20. The ALJ failed to engage in the SSR 83-20
analysis to infer properly Ms. Haran's onset date. The
onset date of alleged congestive heart failure and pulmonary
impairments were slowly progressing impairments, and an ME
should have been used in determining the disability onset
date.

Similarly, the ALJ did not mention Ms. Haran's work
history in terms of her alleged mental impairment and only
mentioned in passing Ms. Haran's own testimony regarding the
effect of her alleged mental impairment. Nor did the ALJ
engage in an SSR 83-20 analysis. Ms. Haran had not been
regularly employed since 1994, due to poor health, and she
testified that she had quit the telephone representative job
due to breathing difficulties and a persistent cough. These
factors are given scant attention in the ALJ's decision.
Because the ALJ had little objective evidence of a mental
impairment, a diagnosis date was an inappropriate onset date
and the use  of an ME was needed in order to determine if
the physical and mental impairments impacted Ms. Haran's RFC

at an earlier date.

## III. The ALJ Was Not Required to Rely on Dr. Abramson's Testimony.

Ms. Haran contends that the ALJ should have referred to Dr. Abramson's testimony (which was favorable to Ms. Haran's claims) as it was discussed in ALJ Karmgard's decision. The Commissioner counters that, because the hearing before the ALJ was *de novo*, Dr. Abramson's testimony is no longer part of the record.

During Ms. Haran's first hearing, ALJ Karmgard called Dr. Abramson as an ME to assist him in formulating an RFC. Although Dr. Abramson's testimony was part of the record, the tapes from this hearing were lost and ALJ Karmgard's decision was vacated and remanded. *See Barrientos v. Barnhart*, No. 00 C 7407, 2004 WL 1381126 (N.D. Ill. May 7, 2004) (noting that because tapes from first hearing were lost and evidence was struck, the testimony was no longer part of the record).

The ALJ could not have considered Dr. Abramson's testimony, because, despite ALJ Karmgard's discussion of the evidence in his decision, the tapes were not available. Instead, the ALJ was charged with conducting a *de novo* review of Ms. Haran's claims. In this *de novo* hearing, Dr.

Abramson's testimony had no bearing on the RFC determination. Therefore, ALJ Karmgard's RFC determination should not be compared to subsequent findings in the new hearing; the basis of appeal is limited to a review of the ALJ's determination based upon the evidence properly before her.

## IV. The ALJ Was Not Required to Accept Dr. Freeman's Opinion.

Ms. Haran disputes the ALJ's decision to disregard much of Dr. Freeman's opinion. The Commissioner counters that the ALJ accepted Dr. Freeman's opinions where it was supported by the evidence, specifically referring to the cardiac and ankle impairments' effect on Ms. Haran's RFC after July 16, 1996. The Commissioner contends that the ALJ only disregarded Dr. Freeman's opinion where it was not supported by the record, claiming that Dr. Freeman's opinions that Ms. Haran was capable of less than sedentary work prior to July 16, 1996 and his opinion that Ms. Haran's mental impairments were severe prior to July 16, 1996 were contradicted by other parts of the record.

An ALJ must assign more weight to the opinion of an examining physician than to a non-examining physician. 20 C.F.R. § 404.1527(d). Where treating and consulting

physicians offer conflicting evidence, an ALJ may decide whom to believe if substantial evidence supports that decision. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In addition, an ALJ is required to consider opinions offered by medical experts, but she is not bound by such opinions "and must evaluate them in the context of the expert's medical specialty and expertise, supporting evidence in the record, and other explanations regarding the opinion." *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. §§ 404.1527(f)(2); 416.927(f)(2). The ALJ must also "consider the supportability of the opinion, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist." *Id.*; SSR 96-6p.

Dr. Freeman opined that Ms. Haran's cardiac dysfunction may have led to mental impairments as early as 1993. However, the ALJ dismissed this portion of Dr. Freeman's opinion, because she concluded that Dr. Freeman was merely a consulting physician and that there was no other medical evidence of a mental impairment prior to July 1996. The ALJ was correct that, ordinarily, a treating physician's opinion

would be afforded more weight. Here, Dr. Freeman was not a
treating physician and merely a consulting physician who
reviewed Ms. Haran's medical evidence before the third
hearing.

Because Dr. Freeman was not a treating physician, the
ALJ was obligated to apply SSR 96-6p, which required her to
consider the supportability of the consulting medical
opinion, the consistency of the opinion with the record as a
whole, and other opinions in the record. Here, the ALJ
compared Dr. Freeman's opinion to others present in the
record, including Dr. Beebe's opinion, who first concretely
diagnosed Ms. Haran's mental impairment, and Dr. Arbit's,
who found little evidence of a mental impairment, but did
diagnose an anxiety disorder. These physicians had more
interaction with Ms. Haran than Dr. Freeman did.

The ALJ also did not accept Dr. Freeman's opinion
regarding Ms. Haran's physical limitations, which included
severe mobility restrictions, concluding that this opinion
was not supported by the record. The ALJ's decision to be
unconvinced by Dr. Freeman's opinions are within her
discretion to weigh the evidence, because "[a] contrary
opinion by a non-treating physician does not constitute
substantial evidence." *Gudgel v. Barnhart*, 345 F.3d 467,

470 (7th Cir. 2003). Because Dr. Freeman merely reviewed the evidence and was not Ms. Haran's treating physician, and because other evidence in the record tended to undermine Dr. Freeman's conclusions, the ALJ was free to reject all or party of it. The ALJ sufficiently considered his opinion and properly decided that portions of his opinion were not supported by the evidence, as required by 96-6p.

**V.  The ALJ's Steps Four and Five Sequential Evaluation Process Was in Error.**

**A.  The ALJ's Step Four Analysis was In Error for the Period before July 16, 1996.**

Ms. Haran argues that the ALJ erred at Step Four of the sequential evaluation process. Specifically, Ms. Haran argues that the ALJ erred in finding that Ms. Haran was not precluded from waitress and bartender work. Ms. Haran asserts that the ALJ failed to make a complete inquiry into the specific demands of those jobs, failed to make a finding of fact as to the physical and mental demands of the work, and neglected to make a finding of fact that Ms. Haran's RFC would permit her to return to such jobs, as is required by SSR 82-62. Ms. Haran contends that the ALJ did not properly consider whether an obese, middle-aged claimant, status-post right ankle fracture, with an aversion to pulmonary irritants, and congestive heart failure, could perform Ms.

44

Haran's past relevant work from the period between February 3, 1993 and July 16, 1996.

The Commissioner argues that Ms. Haran has not pointed to any evidence or testimony that the ALJ did not consider in making her Step Four determination. Further, the Commissioner contends that Ms. Haran did not establish that her alleged impairments severely impaired her RFC or her ability to perform past relevant work. The Commissioner notes that Ms. Haran retains the burden of production and persuasion until Step Five. Finally, the Commissioner notes that, even if the ALJ erred in determining that Ms. Haran could return to her past relevant work, the ALJ continued to an alternative Step Five finding.

To determine whether a claimant can perform his or her past relevant work, the ALJ must make findings regarding the individual's RFC, the physical and mental demands of the past job, and whether the individual's RFC permits the claimant to return to that job. SSR 82-62. The ALJ's analysis "must include an adequate rationale to support these factual findings, as 'the decision as to whether the claimant retains the functional capacity to perform past work . . . has far-reaching implications and must be developed and explained fully.' " *Elliot v. Barnhart*, 2005

U.S. Dist. LEXIS 22510 * 13 (N.D. Ind. Oct. 4, 2005)
(quoting SSR 82-62). An ALJ may describe an RFC by
reference to exertional categories such as "light,"
"medium," or "heavy," but "the ALJ must first make a more
detailed function-by-function assessment of the claimant's
current physical and mental abilities so that he may later
compare these abilities to the demands of the claimant's
past work." *Id.* (quoting SSR 96-8p).

Next, an ALJ should determine "the physical and mental
demands of the past job." SSR 82-62. At this stage, the
ALJ should not depend solely on "generic" descriptions such
as " 'sedentary,' 'light,' 'medium,' or 'heavy' exertional
level." *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir.
1991). The ALJ must consider the physical requirements of
past relevant work, "because not all jobs within each of
those categories require identical exertional demands." *Dodd
v. Shalala*, 46 F.3d 1133 (7th Cir. 1994); SSR 82-62.
Lastly, the ALJ must determine whether the claimant's RFC
will allow a return to past relevant work. SSR 82-62. To
fulfill this obligation, the ALJ must compare the physical
demands of the claimant's former work with the claimant's
existing abilities. *Strittmatter v. Schweiker,* 729 F.2d
507, 509 (7th Cir. 1985). The ALJ "must list the specific

physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Nolen*, 939 F.2d at 518.

The ALJ's assessment of Ms. Haran's ability to perform her past relevant work was split into an analysis of her capabilities before and after July 15, 1996. For the period before July 15, 1996, The ALJ determined that Ms. Haran was capable of light work, but did not make specific findings of fact regarding the physical and mental demands of Ms. Haran's past work. The ALJ eliminated telephone sales representative as past relevant work, due to the high stress of that job. The ALJ merely referred to the exertional category of "sedentary" for Ms. Haran's telephone sales representative experience, and "light-to-medium" level of exertion for her serving and bartending experience. For this period[4], with an RFC for light work, the ALJ did not sufficiently compare the physical demands of the job with Ms. Haran's capabilities. The ALJ did not consider the impact, if any, that Ms. Haran's fractured ankle, obesity,

---

[4] For the period after July 15, 1996, when the ALJ determined that Ms. Haran had an RFC for no more than sedentary work, the ALJ determined that Ms. Haran was unable to perform past relevant work. This part of the ALJ's opinion is not in dispute.

or pulmonary constraints would have on her ability to work as a bartender or waitress. The ALJ failed to identify the physical demands of serving or bartending, and she failed to explain why Ms. Haran could take on these demands, despite her limitations.

Therefore, the Court concludes that the ALJ's conclusion that Ms. Haran retained the ability to perform past relevant work as a bartender or waitress did not comport with the requirements of SSR 82-62. And, as discussed below, the Commissioner's argument that the ALJ's alternative Step 5 finding salvages any error made by the ALJ at Step 4, is without merit.

## B. The ALJ's Step Five Analysis Was In Error

Ms. Haran argues that the ALJ failed to include Ms. Haran's allegations of mental limitations, obesity, and mobility limitations in the hypothetical questions she posed to VE Entenberg. Ms. Haran maintains that, because the hypothetical questioning was incomplete, VE Entenberg's opinions cannot be substantial evidence supporting the ALJ's decision at Step Five.

The Commissioner contends that, because the ALJ's RFC finding was supported by substantial evidence, and because

her questioning reflected that RFC, the questioning was complete. The Commissioner argues that the ALJ did incorporate Ms. Haran's obesity and mobility limitations, by limiting Ms. Haran to light work, and precluded high stress jobs, to accommodate Ms. Haran's alleged mental limitations after July 16, 1996. The Commissioner contends that, because VE Entenberg opined that there were 55,000 unskilled, light-exertion jobs available regionally, substantial evidence supports the ALJ's Step Five determination that Ms. Haran was not disabled before July 16, 1996.

The Commissioner has the burden at Step Five to establish the existence of a significant number of jobs that the claimant can perform. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). If an ALJ relies on the testimony of the VE to make a Step Five determination, the questions posed to the VE "must incorporate all relevant limitations from which the claimant suffers." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). However, the hypothetical questions do not need to consider every detail of the claimant's impairments, as long as the record discloses that the VE reviewed all the evidence before the hearing. *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993).

A hypothetical question must be supported by the
medical evidence found in the record and must set forth the
alleged impairments of the claimant. *Meredith v. Bowen*, 833
F.2d 650, 654 (7th Cir. 1987); *Herron v. Shalala*, 19 F.3d
329, 337 (7th Cir. 1994). While an ALJ should strive to
pose hypothetical questions that encompass all relevant
aspects of the medical evidence, "no principle of
administrative law or common sense requires us to remand a
case in quest of a perfect opinion unless there is reason to
believe that the remand might lead to a different result."
*Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

Based on the RFC finding and the hypothetical questions
posed to VE Entenberg, for the period before July 16, 1996,
the ALJ found that Ms. Haran was not disabled, because she
retained the ability to perform her past relevant work as a
bartender and server. The hypothetical questions referred
to the exertional limitation of Ms. Haran's past relevant
work, as light and medium unskilled and sedentary semi-
skilled. The ALJ limited her questioning to Ms. Haran's
ability to lift and carry and her mobility capabilities.

The ALJ also restricted Ms. Haran's exposure to
concentrated or moderate pulmonary irritants and restricted
high-stress jobs. The ALJ mentioned that, prior to July 16,

50

1996, Ms. Haran would be able to perform the work of waitress or bartender "both as she previously performed that work and as that work is generally performed in the national economy." R. at 32. VE Entenberg testified that there are 55,000 sedentary and light work positions in the area.

However, in posing the hypothetical questions to VE Entenber, the ALJ relied upon an RFC that she arrived at without the benefit of ME testimony. As discussed above, the ALJ's failure to call upon an ME to determine the effect Ms. Haran's mental and physical limitations had on her RFC was in error. While this court does not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner," *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), an RFC incorporating some of the mental and physical limitations that the ALJ acknowledged existed after July 15, 1996 could have altered the hypotheticals to VE Entenberg. Therefore, the ALJ's Step Five inquiry as to the period before July 16, 1996 was in error, as it did not sufficiently address all of Ms. Haran's physical and mental impairments that may have affected her RFC.

**VI. The ALJ Properly Analyzed Ms. Haran's Ability to Perform the Demands of a Competitive Workplace and Sufficiently Considered the Impact Ms. Haran's Obesity Would Have on Her RFC**

Ms. Haran argues that the ALJ failed to evaluate whether she could perform the demands of competitive work and ignored her subjective complaints. She claims that the ALJ did not consider whether her obesity and arthritis would impact her RFC.

The Commissioner counters that the ALJ properly considered Ms. Haran's 1989 hospitalization, right ankle fracture and related mobility restrictions, and all relevant evidence, as well as gaps in Ms. Haran's treatment history. The Commissioner contends that the ALJ considered Ms. Haran's obesity; however, Ms. Haran did not offer any evidence that her obesity or arthritis impaired her work abilities.

**A. The ALJ Adequately Evaluated Ms. Haran's Work-Related Abilities Before Assessing Her RFC**

Under SSR 96-8p, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." To determine a physical

RFC, "the ALJ must first determine the claimant's ability to sit, stand, walk, lift, carry, push and pull before assigning an exertional category, e.g., sedentary, light, medium, heavy." *Lechner v. Barnhart*, 321 F.Supp. 2d 1015, 1036, n.27 (E.D. Wis. 2004) (citing SSR 96-8p).

However, "SSR 96-8p contains no similar directive regarding the manner in which the ALJ may translate mental RFC into categories or otherwise express it in shorthand fashion." *Id.* To assess an RFC using SSR 96-8p, the ALJ should articulate "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." In addition, the ALJ must:

> discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p.

The Court rejects Ms. Haran's argument that the ALJ ignored her subjective complaints and did not adequately

address her ability to perform work-related tasks.  The ALJ made specific evaluations of Ms. Haran's ability to lift and carry, sit, stand, or walk, and determined how many hours of the workday Ms. Haran could perform these work activities prior to July 16, 1996.  The ALJ also evaluated Ms. Haran's ability to lift and carry more than 10 pounds, stand or walk more than 2 hours, or sit or stand more than 6 hours of an eight-hour workday.    The ALJ assessed the impact of Ms. Haran's mental limitations on her RFC after July 16, 1996, including her "ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, relate predictably to others in social situations, and understand, remember, and carry out complex job instructions."  For these RFC assessments, The ALJ determined Ms. Haran's abilities before assigning an exertional level; she also set out Ms. Haran's ability to perform work activities in a work setting and described the maximum amount of each task she would be able to perform based on the evidence.  Because the ALJ complied with SSR 96-8p, the Court rejects Ms. Haran's claim of error in this regard.

**B. The ALJ Sufficiently Considered the Impact of Ms. Haran's Obesity on Her RFC**

Ms. Haran argues that the ALJ did not consider the combined effect that her obesity and arthritis would have on her RFC. The Commissioner counters that the ALJ noted Ms. Haran's height and weight on several occasions, but claims that the medical evidence does not support her allegations of the limiting effect of her weight.

Obesity may be considered in determining a severely limiting impairment, impacting an individual's RFC. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). An ALJ can decide whether a claimant's alleged obesity is a medically determinable impairment, based on a diagnosis by a treating or consulting physician, or on claimant records that show high body weight. SSR 02-1p at 3. Once this determination is made, the ALJ must determine whether the obesity related impairment is severe. *Id.*

The ALJ was aware of Ms. Haran's weight, and noted it throughout the opinion. Ms. Haran testified that her weight fluctuated, and the medical evidence supports that testimony. The ALJ noted Dr. Bacalla's diagnosis that, in January of 1994, Ms. Haran was obese. R. at 24-25. The ALJ also noted Ms. Haran's Body Mass Index of 35.6, which

suggests mild-to-moderate obesity. In addition, the ALJ considered Dr. Panopio's notation of a decreasing Body Mass Index as evidence of mild obesity in July of 1996, and noted that Ms. Haran's weight had dropped in June of 1997. R. at 26- 27.

While the ALJ's mobility restrictions may have accounted for Ms. Haran's obesity, she did not specifically question VE Entenberg as to the effect obesity would have on Ms. Haran's ability to perform her past relevant work. The ALJ also only mentions Ms. Haran's arthritis in relation to Dr. Freeman's opinion, Ms. Haran's personal consulting physician, who found that Ms. Haran had right ankle arthritis. Other than Dr. Freeman's opinion, there are no medical opinions that stated that Ms. Haran's obesity and arthritis had an amplifying effect on her RFC. While this Court would not send this matter back to the Commissioner on this basis alone, upon remand, the Court suggests that the ALJ incorporate all medically-supportable impairments in questioning the VE.

**VII.  The ALJ's Credibility Findings**

**A.  Consideration of Subjective Complaints, Ms. Haran's Smoking Habit, and Her Ability to Engage in Daily Activities**

Ms. Haran argues that the ALJ improperly weighed her

56

smoking habit in determining her RFC. Ms. Haran also
contends that the ALJ improperly concluded that her ability
to do limited housework, minimal grocery shopping, and to
negotiate stairs meant she was able to perform a range of
light work.

The Commissioner responds that the ALJ adequately
considered Ms. Haran's subjective complaints, but found the
evidence unpersuasive. For example, the ALJ recognized Ms.
Haran's complaints about chronic coughing, but questioned
whether Ms. Haran's smoking habit exacerbated it.
Similarly, the ALJ considered Ms. Haran's testimony about
her mobility limitations, but found it dispositive that Ms.
Haran lived on the second-floor, which required the use of
stairs, and that she was able to conduct her daily
activities without help.

The inquiry for credibility findings is whether the
finding was supported by the record; however, credibility
findings are afforded "special deference." *Scheck v.
Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). An ALJ's
credibility determination is given deference because the ALJ
had the "opportunity to personally observe the claimant's
demeanor at the hearing." *Windus v. Barnhart*, 345 F. Supp.
2d 928, 945 (E.D. Wis. 2004). An ALJ's credibility

determination will be reversed only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, if the ALJ does "not build an accurate and logical bridge between the evidence and the result," then the determination will not be upheld. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

An ALJ's credibility determination is also subject to SSR 96-7p. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 96-7p lays out a two-step guideline for assessing subjective testimony about "pain, fatigue or weakness," and includes inquiries into the following:

> First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities . . . . Second, if an impairment that could reasonably produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to perform basic work activities. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.

*Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1054-55 (E.D.Wis. 2005).

An ALJ cannot "disregard subjective complaints merely because they are not fully supported by objective medical evidence," but an ALJ may disregard evidence that is "inconsistent with the evidence as a whole." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). An ALJ should also consider other factors, such as: "(a) the claimant's daily activities; (b) the location, duration, frequency and intensity of the pain; (c) precipitating and aggravating factors; (d) type, dosage, effectiveness and side effects of medication; (e) treatment other than medication; (f) any measures the claimant has used to relieve the pain or other symptoms; and, (g) functional limitations and restrictions." 20 C.F.R. § 404.1529(c)(3). In considering these factors and making a credibility determination, the ALJ must show the logical steps in his or her determination in order to ensure that a reviewing court may follow her reasoning. *Blom*, 363 F. Supp. 2d at 1055.

The ALJ's decision states that she considered Ms. Haran's subjective complaints and was not convinced. While the ALJ did consider medical opinions that referred to the severity of Ms. Haran's complaints, she noted significant gaps in the medical records. The ALJ does not give more than a cursory treatment to Ms. Haran's subjective

complaints about a persistent cough and dismisses these complaints without fully articulating her reasoning. The ALJ concluded that it was likely that Ms. Haran's continuing smoking habit was an exacerbation of her emphysema and chronic coughing. However, there were no medical diagnoses of the effect of Ms. Haran's smoking on her ailments.

SSR 96-7p requires a more detailed inquiry. Pursuant to this Ruling, the ALJ was required to consider whether the underlying medically determinable physical impairment could cause Ms. Haran's coughing. If she determined that this impairment could have caused the complaint, then the ALJ should have considered whether the symptoms could have affected Ms. Haran's ability to perform work activities. The ALJ's conclusions concerning Ms. Haran's smoking formed a basis for an RFC after July 16, 1996, which does not include a limitation on exposure to pulmonary irritants. Given that this RFC informed the subsequent inquires, 96-7p required a more detailed analysis.

The ALJ also considered Ms. Haran's ability to perform daily living activities without much assistance and to live alone, when she determined that Ms. Haran could perform a limited range of light work. Admittedly, the ALJ merely stated that Ms. Haran was able to do "laundry, clean her

apartment and shop for groceries," R. at 116, without

elaborating. While the ability to do certain household

chores does not always coincide with an ability to work

full-time, *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.

2001), the Court cannot say that the ALJ erred in concluding

that Ms. Haran's ability to accomplish these tasks was

relevant in determining her RFC. The ALJ considered the

opinions of DDS medical consultants, in conjunction with Ms.

Haran's testimony about her limitations, as well as

additional medical evidence, to determine that Ms. Haran's

RFC was more limited than in her previous decision. Despite

a lack of detailed articulation in the ALJ's assessments,

there is still other substantial evidence that supports her

credibility determination.

**B.   The ALJ Improperly Considered Ms. Haran's Application for Unemployment Benefits in Making Her Credibility Determination.**

Ms. Haran contends that the ALJ improperly considered

Ms. Haran's application for unemployment benefits. This

issue was addressed in the ALJ's first decision, but not in

her second decision, and the Commissioner does not mention

this issue in her memorandum in support of her motion for

summary judgment. Ms. Haran did apply for unemployment

benefits in February of 1996, but she was denied because she

had not paid enough into the system and because she had voluntarily left her last job. While an ALJ cannot consider the application for unemployment compensation as the sole basis for the denial of disability benefits, the ALJ merely considered it as one of a few areas of contradiction that she saw as flaws in the Ms. Haran's credibility. It was clearly not the sole factor of the ALJ's credibility determination and merely informed the ALJ's determination of an earlier onset date. It may also have informed the ALJ's determination of Ms. Haran's reliability concerning her allegation, since she would have had to claim the ability to work to receive unemployment benefits. Because there are other sources of evidence that the ALJ used in her credibility determination, this one factor is not enough to make her decision patently wrong.

However, upon remand, the ALJ is instructed to be mindful that "merely completing a form to get the [unemployment benefits] is hardly an affirmation that he can work, and it is unlikely that a lay person would undertand the legal significance of the word 'able' in agreeing that he is 'ready, willing, and able' to work . . . . Thus this evidence does not contradict his claim for disability." *Guzman v. Barnhart,* 2:01-CV-00384-PRC, at p. 15 (N.D. Ind.

June 2, 2005).

## **Conclusion**

While an ALJ generally is not required to call upon the testimony of a Medical Expert, in the case of slowly progressing impairments, ME testimony can be vital. The ALJ's failure to call upon a Medical Examiner to assist in determining Ms. Haran's appropriate onset date requires this Court to remand the matter back to the Commissioner. In addition, the ALJ erred at Step 4 of the evaluation process. The ALJ should have expressly considered the physical and mental demands of Ms. Haran's past relevant work in deciding whether she could return to those positions. For those reasons, and other considerations discussed in this Memorandum Opinion and Order, Ms. Haran's case is remanded back to the Commissioner.

It is THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment to Remand the Case be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, DENIED.

Dated: May 16, 2006        E N T E R:

ARLANDER KEYS
United States Magistrate Judge